## TALBOTT v. METROPOLITAN LIFE INS. CO.

(Circuit Court of Appeals, Fifth Circuit. January 16, 1906. Rehearing Denied April 3, 1906.)

### No. 1,443.

1. INSURANCE—ACCEPTANCE OF PREMIUM AFTER DUE—AUTHORITY OF AGENT.
    Where the general agent of a life insurance company had authority to accept payment of premiums at any time within 30 days after they became due, provided the policy holder was then insurable, his accept-

ance of a premium and delivery of the receipt therefor within such time, either himself or through a collecting agent, operated to renew and extend the policy from that time, even though he had no authority to agree to an extension, so as to keep the policy in force during the time of such extension before payment of the premium.

2. SAME—ACTION ON POLICY—PAYMENT OF PREMIUM.

The general agent of a life insurance company, having authority to accept payment of renewal premiums at any time within 30 days after they became due, sent a policy holder's receipt to a bank for collection, with instructions that it might be held a reasonable time. On the last day of the 30 days' grace the insured went to the bank, of which he was a customer, and gave the bank a draft on a third party for the amount of the premium and interest. The bank stamped the receipt "Paid" and delivered it, entered the payment on its books, and drew its own draft in favor of the agent for the amount of the premium less its charges, and inclosed it in a letter for mailing, but it was not then deposited in the mail. The draft made by the insured was dishonored, and on notice of such fact a satisfactory arrangement was made by him to protect the bank, and four days after the delivery of the receipt the draft in favor of the agent was mailed to him. On the same day the insured was killed, and, learning such fact, the agent refused to accept the payment. The renewal receipt contained a provision that if any check or draft was taken by the company it should not constitute payment until it was collected. *Held*, in an action on the policy, that whether the transaction constituted a payment on the day of the delivery of the receipt depended on whether the draft was taken by the bank for the company or whether the bank itself discounted it and advanced the money, which, in view of the circumstances and relation between the bank and the insured, was a question for the jury.

In Error to the Circuit Court of the United States for the Northern District of Texas.

Wendel Spence (Wright & Wynn, on the brief), for plaintiff in error.

Maurice E. Locke and Eugene P. Locke, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. This is an action brought by Camilla B. Talbott, a citizen of the state of Texas, as the administratrix of William S. Talbott, deceased, against the Metropolitan Life Insurance Company, a corporation incorporated under the laws of the state of New York, to recover $10,000, the amount of an insurance policy issued by the company on the life of the plaintiff's intestate, in favor of his estate. The suit was brought in the district court of Tom Green county, Tex., and was removed to the Circuit Court for the Northern District of Texas. One of the defenses interposed by the defendant company was that the policy was forfeited and made void because the insured failed to pay the premium which became due on the policy on the 24th day of September, 1903. The case was tried, evidence being received on this and other issues, and the court directed the jury to return a verdict for the defendant. The plaintiff excepted to this action of the court, and, verdict and judgment having been entered for the defendant, the plaintiff brought the case here on writ of error.

The policy is dated September 24, 1900. It called for a first premium, and annual premiums thereafter, of $228.50, payable on Sep-

tember 24th of each year. The first payment was made at the date of the policy, and the premiums were paid to the satisfaction of the company for the next two years. There is no dispute as to the first three premiums. L. O. Robertson was the company's general agent and the manager of its business in Texas, with authority, and charged with the duty, to collect premiums from policy holders. The company furnished him with premium receipts issued by the company, which he countersigned and sent out from Dallas, Tex., to banks in the neighborhood of the policy holders. On August 29, 1903, he sent the receipt for the premium on Talbott's policy, which was due on September 24th of that year, to the San Angelo National Bank at San Angelo, Tex., with a letter stating that it "may be held reasonable time if requested." Talbott was notified that the premium receipt was at the bank and that the premium was due on September 24th. There is no evidence tending to show that he made any payment or settlement of the premium in question before October 24th, and the case depends mainly on the evidence as to what occurred on that day.

The policy contained a provision causing a forfeiture of the same upon the policy holder's failure to pay the annual premium when due, and also provisions limiting the authority of agents as to the extension of time for the payment of premiums. These provisions being for the benefit of the company, the company could waive them if it chose to do so. Insurance Company v. Norton, 96 U. S. 234, 24 L. Ed. 689. It is contended by the plaintiff in error that the company did waive these provisions, and that its agent, Robertson, had authority to extend the time for paying the premium from September 24th to October 24th in such way as to bind the company to accept the premium when tendered between those dates, and that the agent did so extend the time. The defendant in error denies that the agent had such authority, but claims that, if he had such authority, it is not shown by the evidence that he exercised it. The case presented to us by the record does not necessarily turn on the solution of these questions. We deem it, therefore, unnecessary to state and comment on the documentary or other evidence bearing solely on those two questions.

It is conceded by the company, and the evidence clearly shows, that Robertson, its agent, had authority to accept an overdue premium within 30 days after maturity, provided he had no reason to doubt that the policy holder was still insurable. The learned counsel for the insurance company say:

"(1) Waiver of the forfeiture consequent upon default in the payment of a premium by accepting payment after maturity from a policy holder supposed to be in good health, and (2) alteration of the contract by changing the due date of the premium in advance, so as to make the insurer liable upon the occurrence of death within the period of the extension, or compel it to accept the money, if tendered, and continue the insurance in force regardless of changed conditions, are two very different things; and authority to do the first does by no means include authority to do the second. Mr. Robertson was authorized by the company to do the first of these two things, but not the second."

If it be conceded, therefore, that he had no right to make a contract binding on the company to extend the time of payment after it was due so as to keep the policy valid, he did, nevertheless, have au-

thority, if he had no reason to doubt that the policy holder was still insurable, to receive the premium within 30 days after it became due and deliver the receipt of the company renewing and continuing the policy in force. This authority Robertson could exercise, and did in some instances exercise, by making the collections of past due premiums and delivering the receipts therefor through the agency of banks convenient to the policy holders. The premium in question became due, as we have stated, on September 24, 1903. The period in which Robertson was authorized to receive the premium, on the condition that the insured was in good health, or that he (Robertson) had no reason to doubt that the policy holder was still insurable, extended to and included October 24, 1903, a period of 30 days after the premium became due. Robertson sent the receipt for the premium, duly signed by the proper officers of the company and countersigned by him, to the San Angelo National Bank, with authority to collect the premium and deliver the receipt to Talbott, the insured. He sent Talbott several notices to call at the bank and pay the premium. The last one, sent October 17, 1903, stated that:

"The annual premium of $228.50 on policy No. 191,065 was due and payable on the 24th day of Sept. Recpt. at San Angelo Nat. Bank yet. Your 30 days' grace will be gone on Oct. 24th. Better look after it."

Under these circumstances, we think it cannot be questioned that, if Talbott, before or on October 24, 1903, paid in money to the San Angelo National Bank the amount of the premium on the policy and received the premium receipt, the policy was renewed until September 24, 1904. This is true, whether Robertson had authority to extend the policy or not, and whether he made an agreement for 30 days' extension or not, because he did have authority within the 30 days after the maturity of the policy to receive the premium and deliver the receipt. He could, of course, do this through the bank, or other collection agency.

This brings us to the main question of fact in the case: Did Talbott pay the premium to the bank? Was the evidence such as to make that a question for the jury? Or, to present the question as presented by the record, was the evidence such as to justify the trial court in holding as matter of law that the premium was not paid, and in directing a verdict for the defendant? This question must be considered in the light of all the evidence bearing on it. But the evidence showing the transaction between Talbott and the bank must be briefly stated.

On October 24, 1903, Talbott called at the San Angelo National Bank and saw A. B. Sherwood, the teller of the bank, who had charge of the bank's collections. He exhibited the notice from Robertson and asked Sherwood to calculate the interest then due on the premium. When Sherwood did this and stated the amount, Talbott wrote out and gave to Sherwood a draft on the Flato Commission Company at Ft. Worth, Tex., of which concern Talbott was the representative at San Angelo. The draft was for the amount of the premium with the interest then accrued, and was payable at sight to the order of the San Angelo National Bank for the sum of $229.64, and was

addressed to the Flato Commission Company, Ft. Worth, Tex. Sherwood received this draft and stamped the premium receipt "Paid" and placed it with Talbott's insurance policy in a box at the bank used by Talbott for keeping his private papers. The collection of the premium was at once entered on the bank's books; and the transaction passed through the bank's books on that date showing the collection for the company. A draft was then drawn by the bank in favor of L. O. Robertson, state manager, for the amount of the collection, less the bank's charge for the service; the draft being signed by R. A. Hall, Cashier, and addressed to the City National Bank, Dallas, Tex. A letter was also then written, addressed to L. O. Robertson, state agent, Dallas, Tex., showing the collection of principal and interest, and the draft and letter were placed in an envelope duly addressed to L. O. Robertson, state agent, Dallas, Tex., and stamped, and the same was placed by the remittance clerk with the bank's mail to be forwared in due course of mail on that day. At a later time during the day, the teller of the bank withdrew this letter from the bank's mail, and it was not then deposited in the post office. The draft on the Flato Commission Company drawn by Talbott went forward in due course to Ft. Worth and was presented to the Flato Commission Company, but was dishonored, and the San Angelo National Bank was notified by telegram of that fact on October 27th. Sherwood, the teller, and also Hall, the cashier, of the bank, then at once saw Talbott and informed him that his draft had been refused payment. Talbott expressed surprise, but stated that he would arrange the matter to the bank's satisfaction; and it was then agreed that he and his wife should give a note to the bank to take up the draft. This was satisfactory to the bank. Talbott, being informed that the bank's draft in favor of Robertson in payment of his premium had not up to that time been sent to Dallas, secured the promise of Hall, the cashier, that that draft should go forward by next mail to Dallas. The only mail train from San Angelo to Dallas having already left San Angelo at that time, it was agreed between Talbott and Hall, the cashier, that Talbott need not bring the note to the bank on that day to take up the Flato draft, but that the note would be brought to the bank during the next day, October 28th. During the forenoon of October 28th, and before the note had been brought to the bank. Talbott was killed. During that day, by agreement between Hall, the cashier, and Mrs. Talbott, the amount of the Flato draft was charged to her account by the bank. The draft issued by the San Angelo National Bank, on October 24, 1903, upon the City National Bank of Dallas, in favor of L. O. Robertson, state manager, for the premium as above stated, was mailed on that day and reached him at his office in Dallas on October 29th. Before that time Robertson had noticed in the newspaper an account of the death of Talbott. He refused to accept the draft, and at once returned it to the San Angelo National Bank, with a letter stating that Talbott's policy was void.

In considering this evidence, it should be borne in mind that the bank was acting in a dual capacity. It was the agent of the insurance company to collect the premium. Talbott was a client of the bank, and it was accustomed to discount or cash drafts for him drawn on third

parties. His insurance policy and private papers were deposited for safe keeping in the bank. Where a man goes to a bank and delivers drafts or checks, the transaction may take different forms and have different effects, depending on the instructions given by the client to the bank and on the intention of the parties. It may be a deposit to credit, or a deposit for collection, or the bank may make a loan on the draft, or it may become the purchaser and owner of the draft. Zane on Banks and Banking, § 133. If the bank received Talbott's draft for collection only, without agreement expressed or implied that it was received as payment, it is clear that the premium was not paid by the draft; that is, if the understanding was to the effect that the draft was to be forwarded for collection, and, if collected, the proceeds were to be applied to the payment of the premium, there was no payment of the premium on the 24th of October, for the draft was dishonored, and not paid. If such is the proper inference to be drawn from the evidence, there was no payment of the premium, and the policy was not in force on the 28th day of October, 1903, when Talbott died. If, on the other hand, the transaction was such that the premium was paid—that the bank received and held the amount thereof in money for the insurance company and duly delivered the premium receipt—the policy was in force when the insured died. If the teller, on receiving the draft, had handed to Talbott the amount of the draft in cash, and Talbott had handed the money back to the teller to pay the premium, and the teller had delivered to Talbott the renewal receipt, the case would have been plainly one of payment. If the insured and the teller so intended, could it not equally as well have been a payment of the premium without the useless manipulation of the money by handing it out of the cashier's window and handing it back again? We think so; for, if the draft was delivered to the bank, not for collection, but for cash to be advanced contemporaneously and sent to Robertson to pay the premium, the transaction was in effect the same as if the money had been handed to Talbott and by him returned to the bank. National Bank v. Burkhardt, 100 U. S. 689, 25 L. Ed. 766; Morse on Banks and Banking (3d Ed.) p. 915, § 572. If Talbott had gone to another bank and sold his draft for cash, or obtained a cash loan on it, and used the cash to take up the premium receipt in the San Angelo National Bank, the fact of payment would have been clear. If the real transaction was the same, and was so intended by both Talbott and the bank, the same results would follow, although only one bank was a party to the transaction.

It was not, of course, the intention of the insurance company to collect, and the policy holder to pay, the premium in cash, and the company to issue and deliver the receipt, and yet leave the policy holder without insurance for some indefinite length of time. To attribute such an intention to the parties would be to charge one with an act of injustice and the other with an act of folly. Neither could it have been the intention of the parties that the premium should be collected in cash by an authorized agent of the company and the receipt delivered, and the effect of the payment and delivery of the receipt left to the subsequent decision of the company; it being

thereby left free to ratify its agent's acts if such ratification should be to the company's interest, and to repudiate his acts if the event happened which made the policy payable.

The fact that the premium receipt was marked "Paid" and placed with Talbott's private papers in the bank, the entries on the bank's books showing the collection, the making out of a draft to be sent to Robertson for the company, and other facts proved, might at least authorize the jury to infer that the bank cashed the draft for Talbott; the bank taking the draft as owner of it and holding the amount of it as the money of the insurance company paid by Talbott. It is true that other facts were in evidence that might lead to a different conclusion; but it would not be proper to discuss them now, and it is no part of our duty at this time to weigh the evidence further than to decide whether or not it justified the court in giving the peremptory instruction to find a verdict for the defendant.

But it is urged that the transactions between Talbott and the bank did not constitute payment, because the premium receipt had printed on it the stipulation that it "was not binding on the company * . * * until the premium has actually been paid in cash"; and "if a check or draft is given in payment or part payment of this premium, this receipt shall be void and of no effect if said check or draft is not paid upon presentation." To make these provisions of the receipt decisive of the case would be to avoid the question of fact presented, and to assume that the draft was received by the bank from Talbott as the property of the insurance company. The plaintiff's contention is, in effect, that the bank cashed the draft, paid it in money, and placed the money to the credit of the insurance company, or held it as the money of the insurance company, the bank taking the risk of the acceptance and payment of the draft by the drawee or its payment by Talbott. These provisions in the receipt would be applicable where a check or draft, and not money, was received by the company; but we cannot believe them properly applicable if it be true that the bank advanced the cash on the draft and placed it to the company's credit, or held it for the company, being authorized to collect the money for the company. If such be the facts, the company received the money in payment, not the draft, and the money paid Talbott for the draft was held by the bank for the company. The purpose of these provisions in the receipt is to secure the actual payment of the premium in money, and when that is effected by the money being paid to the company or to its collecting agent, the fact that the money was raised on a draft by its sale, or discount, or otherwise, which draft was not paid, is immaterial. These provisions in the receipt only add to the probability that there was no purpose on the part of the bank as the collecting agent of the company to have the company extend any credit to Talbott on account of the draft. These provisions in the receipt gave the bank notice that it ought not to surrender the receipt until the premium was paid in cash, and make the surrender of the receipt a more significant circumstance tending to show payment.

There was error, we hold, in directing the verdict for the defendant. The judgment of the Circuit Court is reversed, and the cause remanded for a new trial.